Pierre DuPONT, Appellant

v.

The STATE of Texas.

No. C14–81–507–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

March 11, 1982.

Bertrand C. Moser, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Houston, for appellee.

Before MILLER, MORSE and JAMES, JJ.

JAMES, Justice.

This appeal arises out of a conviction for rape wherein the punishment was assessed at eight (8) years in the Texas Department of Corrections. We affirm.

Appellant complains in his sole point of error that the evidence was insufficient to support a conviction. He argues that the State did not show that appellant used

force or threats to compel submission as charged in the indictment. Appellant was indicted pursuant to Tex.Penal Code Ann. § 21.02. (Vernon Supp.1982). That statute provides in pertinent part:

Section 21.02. Rape

(a) A person commits an offense if he has sexual intercourse with a female not his wife without the female's consent.

(b) The intercourse is without the female's consent under one or more of the following circumstances:

(1) he compels her to submit or participate by force that overcomes such earnest resistance as might reasonably be expected under the circumstances;

(2) he compels her to submit or participate by any threat, communicated by actions, words, or deeds, that would prevent resistance by a woman of ordinary resolution, under the same or similar circumstances, because of a reasonable fear of harm; . . . .

It is well settled that an indictment which charges a rape to have been committed by force or threats is fully sustained by proof of either of these methods alleged. *Brown v. State,* 576 S.W.2d 820 (Tex.Cr.App.1978); *Lucero v. State,* 502 S.W.2d 750 (Tex.Cr. App.1973). In the instant case, no proof of express threats was introduced. The issue thus presented is whether the force used to compel complainant's submission overcame such earnest resistance as might reasonably be expected under the circumstances.

The facts of this case show a bizarre set of circumstances. At 2:00 A.M. on the morning of January 10, 1981, the prosecutrix and her husband left a nightclub in the Heights area of Houston, Texas. As they were about to enter their car, a man with a gun appeared. Pointing the gun at her husband's head, the gunman ordered the prosecutrix to get into the driver's seat and drive north. During this drive, he yelled out obscenities to her husband, called the prosecutrix a "white bitch," and slapped her several times on the face. This gunman was *not* the appellant.

After driving a short while, the gunman then ordered the husband of the prosecutrix out of the car. He thereafter pointed the gun at her side and kept slapping the prosecutrix across the face while she drove. The prosecutrix testified that the gunman would go into rages saying such things as, "I'm going to kill you just to watch you die" and "If you do exactly as I say I will not kill you." The prosecutrix was subsequently taken to a vacant lot in a very rundown area where she was ordered to take off her clothes. There the gunman sexually abused her with his hand and ordered her to perform a fellatio on him. He thereafter drove her to a motel which the prosecutrix described as "dilapidated." As to what the gunman said when he left the car to secure a room, the prosecutrix testified: "He told me to wait in the car. He told me that if I ran he would kill me, that if he missed me I would be just as bad off in that neighborhood with somebody else that find [sic] me."

The prosecutrix nevertheless left the car and tried desperately to get help. She saw a man leave one of the rooms and get into a black pickup truck. She screamed and told this man that someone was trying to kill her, but this man only pushed her away and told her she would have to talk to the manager. The prosecutrix then hid in the grass next to a trailer house. Her screams for help to the occupants there were to no avail. She testified that she had no idea where she was and that she was extremely frightened.

Hoping to evade the gunman, the prosecutrix remained hidden in the grass for a short while. She then saw a man and a woman in the parking lot. This man was appellant and the woman he was with was named Lou. The prosecutrix ran to them and told them that she had been kidnapped, "raped", and about to be killed. She begged them to take her home. The prosecutrix was led to believe that after appellant and Lou used the motel room, Lou would take her home. Then she asked them to let her go into the room with them. In the room, the prosecutrix looked out the window for any signs of the gunman or the

police. She had been told by appellant that he had called the police.

After approximately one and one-half hours, Lou announced that because it was so late, she would not have time to take the prosecutrix home. Although the prosecutrix offered to pay Lou $75.00 for the ride, Lou refused. It was decided that appellant would take the prosecutrix home. The prosecutrix testified: "She [Lou] said Pierre would not bother me, and that I had her word that he would not bother me...."

Appellant and the prosecutrix got into his car although, as she testified, she was "terrified" because she thought he was going to do something to her. They drove around for several minutes and then the prosecutrix realized that they were going back to the motel. In order to fully understand the events that subsequently took place, parts of the exchange between the prosecutor and the prosecutrix are set out herein:

Q. When did you realize you were going back to the motel?

A. It was about the same time we got to just the general area surrounding the motel, because it was dark and I didn't know the area.

Q. What did you do when you realized that?

A. I just started saying, 'No. No.' And I just sat there in the passenger's seat asking him why we were going back.

Q. What did he say?

A. He said he had forgotten his billfold.

*　　*　　*　　*　　*　　*

Q. Did you go back—did he go back to the motel?

A. Yes.

*　　*　　*　　*　　*　　*

Q. Did anybody get out?

A. He got out.

Q. Then what happened?

A. He went into the motel.

Q. What did you do?

A. I sat in the car.

Q. If you were fearful of something going to happen to you, why didn't you get out and run?

A. I didn't know anywhere to run at that time of night in that neighborhood.

*　　*　　*　　*　　*　　*

Q. How did you feel at that point?

A. I was scared.

Q. Were you tired?

A. And I was tired. Very tired. And I was terrified.

Q. What did you do? What happened after he came out of the motel?

A. He got back in the car and he told me. 'Get out. We're going in.'

*　　*　　*　　*　　*　　*

Q. Okay, did you then get out on the passenger's side?

A. I did.

Q. Okay, what did he do?

A. He got out also and I just stood there and I was crying, and I was saying, 'No. No. No.' And he took my arm.

*　　*　　*　　*　　*　　*

Q. Would you describe his grip on your arm as a firm grip?

A. It was firm.

Q. At this point did you try to break away from him?

A. No, I didn't.

Q. Why not?

A. At this point I felt completely defeated. I had gotten away from the first guy, and I was real happy to be alive. At this point I knew my chances were none whatsoever. This man was a whole lot bigger than I was and I was at this point just about completely exhausted.

*　　*　　*　　*　　*　　*

Q. What happened once you got inside the motel room?

A. He told me to take off my clothes.

*　　*　　*　　*　　*　　*

Q. Did you say anything to him?

A. I kept saying, 'No. No. No,' and, 'I don't understand any of this.' And I was crying.

*　　*　　*　　*　　*　　*

Q. What position were you in on the bed?

A. I was lying on my back.

Q. What position was he in?

A. He was above me.

\* \* \* \* \* \*

Q. Did you give this defendant, Pierre DuPont, your consent to have sexual intercourse with you?

A. No, I did not.

During cross-examination of the prosecutrix, the following ensued:

Q. Would you tell me again what your attitude was?

A. I was crying at that time, and I said, 'No. No. Don't do this.' He was very polite, but he took my hand firmly and walked me into the room and at the time I was crying and saying, 'No. No. Don't do this.'

\* \* \* \* \* \*

Q. Were you terrified of him at that time?

A. Yes, I was terrified of him.

The State concedes in the case at bar that the force used by the appellant to compel the prosecutrix to submit to sexual intercourse was "minimal." A definition of force spelling out a particular amount required to constitute rape would be quite helpful under these circumstances. However, the Court of Criminal Appeals has never written such a definition because the statute itself qualifies the kind of force necessary. This is a "totality of circumstances" issue, see *Brown v. State*, 576 S.W.2d 820 (Tex.Cr.App.1978); therefore, a specific minimum amount of force for conviction is not capable of designation.

Section 21.02 of the present Penal Code was derived from Articles 1183, 1184 and 1185 of the former Penal Code. Article 1184 entitled "Force" provides as follows: "The definition of 'force' as applicable to assault and battery applies also to rape, and it must have been such as might reasonably be supposed to be sufficient to overcome resistance, taking into consideration the relative strength of the parties and the cir-

cumstances of the case." [1] The Court of Criminal Appeals has thus held that it is impossible to lay down a fixed standard by which it may be said that force has or has not been applied in a rape case; the facts in each individual case determine whether force exists. *Brown v. State, supra; Zamora v. State,* 449 S.W.2d 43 (Tex.Cr.App. 1969); *Bundren v. State,* 152 Tex.Cr.R. 45, 211 S.W.2d 197 (1948).

In *Bundren,* a case decided under the former Penal Code, the appellant argued that the female "must put forth every exertion and means within her power to thwart the purpose of her assailant." See 35 Tex.Jur. *Rape* § 60 (1935). The *Bundren* court disapproved of this statement as being too broad. They pointed out that the statement eliminates the material element of Art. 1184 requiring force to be such as might reasonably be supposed sufficient to overcome resistance. Section 21.02 retains this requirement and provides also for what might reasonably be expected "under the circumstances." In the instant case, we could not affirm appellant's conviction based only upon the state of mind of the prosecutrix at the time of the offense. Had the facts and circumstances been identical but appellant not apprised of them, we would agree that the force used here would be insufficient to constitute rape. However, appellant's testimony indicates that the prosecutrix had told him that she had been beaten and raped and left without money and shoes in an unfamiliar part of town. He was also aware that she was screaming for help. In fact, he thought her situation serious enough to warrant a call to the police. Appellant's knowledge of her condition places him "in the circumstances" and her repeated pleas to discourage his advances show earnest resistance on her part. It is not for us or any one to speculate about what she could have done. The statute does not require that the female exercise all possible means of escape before

---

1. Under the assault and battery statute, force *per se* was never defined. The statute referred to "[T]he use of any unlawful violence upon the person of another...." Tex.Penal Code Ann. Art. 1138 (1925).

a conviction may be had. She need not court serious bodily injury or death. Here the jury passed upon the credibility of the witnesses and the weight to be given their testimony. In their estimation, the State proved beyond a reasonable doubt that the amount of force used by appellant overcame what earnest resistance could be expected under these circumstances. Their verdict should not be disturbed. Accordingly, we find the evidence was sufficient to convict appellant and overrule his sole point of error.

We may easily distinguish the principal cases relied upon by appellant. In *Zamora v. State, supra,* the prosecutrix was the stepdaughter of the appellant. The appellant asked her to bring him some coffee in the bedroom. There he requested that she remove her clothes whereupon they then engaged in sexual intercourse. The court pointed out that the prosecutrix failed to make a struggle, *no matter how slight,* and did not cry out at any time prior to or during the alleged act, though her younger sister was nearby. See 449 S.W.2d at 46. In addition, on cross-examination, the prosecutrix admitted that she had had sexual relations with the appellant since she was ten years old. The court there found that the evidence was insufficient to support rape by force. The facts in the instant case show an entirely different set of circumstances. *Zamora* is thus not controlling.

Appellant relies also on *Killingsworth v. State,* 154 Tex.Cr.R. 223, 226 S.W.2d 456 (1950), *aff'd,* 155 Tex.Cr.R. 511, 236 S.W.2d 794 (1951). In that case, the appellant was taking the prosecutrix home in his truck when he pulled over and forced himself on her. She cried and repeatedly tried to get away from him. The Court of Criminal Appeals first held that there was insufficient evidence to convict defendant of rape by force. In reviewing the case a second time, the court affirmed the conviction holding that the jury was warranted in the conclusion it reached. The court stated that they would not be justified in setting aside that conclusion. Such is our belief in the instant case. Accordingly, the conviction is affirmed.